# EXHIBIT D

YBARRA, JOSE   C18150                                                                 October 5, 2005

# MENTAL HEALTH EVALUATION
# FOR THE BOARD OF PRISON TERMS
# NOVEMBER 2005 LIFER HEARING
# SAN QUENTIN STATE PRISON

I. Identifying Information: Mr. Ybarra is a 73-year-old Hispanic, male who is serving a 15-year to life sentence for P187, second degree murder. The report is based on a review of the inmate's central files, medical record and a face to face interview conducted in a mental health office at San Quentin State Prison. Only Mr. Ybarra and the examiner were present at the time of the interview. Mr. Ybarra was informed that the information obtained during the interview was not confidential in that it would be included in a report to the Board of Prison Terms. He stated that he understood this and was voluntarily participating in the interview. Mr. Ybarra denied that he needed any assistance to participate in the interview and he appeared to understand the purpose of the interview and the limits of confidentiality. For reasons not limited to the possibility that an inmate may have a mental disability or other mentally handicapping condition, a licensed psychologist conducted the interview. It was the conclusion of the examiner that Mr. Ybarra did not require auxiliary aids or assistance to achieve effective communication.

II. Psychiatric and Medical History:
Mr. Ybarra has a limited history of treatment for psychiatric conditions. He described two instances of suicidal attempts or gestures. In one instance, he turned on the gas in an oven. In another instance he attempted to cut his wrist. Both times he was discovered and hospitalized at San Francisco General Hospital for observation. He reported receiving mental health treatment following these attempts, but could not remember the name of the clinic where he had received treatment. He has not received mental health treatment while incarcerated and denied any need for mental health treatment at the present time.

Mr. Ybarra has undergone medical tests for prostate cancer. He stated that he has an elevated PSA level, but that his doctors have not been able to find any other physical evidence of the disease, at the present time. He reported being mildly concerned about this, but was not experiencing any extreme anxiety.

III. Plans if Granted Release:
Mr. Ybarra's parole plans hinge largely on his ability to find employment. He stated that he would seek work doing upholstery or body and fender work. He also cited experience in the construction industry as a laborer. He had been receiving SSI prior to his incarceration, but states that he would prefer to work. Mr. Ybarra stated, "As long as I can get a job, I don't think I will have a problem. If no job, I have friends who are willing to help me. It's not going to be a problem.

Mr. Ybarra has two friends who remain in contact with him by mail. One lives in San Francisco and the other in San Rafael. Both of these men have offered to provide temporary housing to help him get on his feet. Mr. Ybarra has no other resources for long-term housing. He is interested in contacting programs, such as halfway houses, that offer housing for parolees. He has written to one program and believes, based on information he has received from the program, that he would need to be paroled before he would be considered for program placement.

Mr. Ybarra has participated in AA since 1955. He finds the program valuable, but believes that, "AA is not going to help you unless you help yourself. He states emphatically that he feels a hatred for any alcohol or drugs. He finds it offensive when someone who has been drinking approaches him. He also emphatically states that "liquor has been my downfall." Mr. Ybarra would be willing to continue participation in AA or

YBARRA, JOSE   C18150                                                                                    October 5, 2005

drug intervention on parole. He does not believe that he is at any risk for relapse, due to his strong negative feelings about drug use, and the fact that he feels that drugs and alcohol have ruined his life.

Mr. Ybarra's extended family resides in Texas, where he has two brothers, one sister and a niece. His siblings are elderly and he has not asked them for assistance. He feels confident that they would help him if he asked for help.

## CLINICAL ASSESSMENT

IV. Current Mental Status/Treatment Needs:
Mr. Ybarra is a compactly built, Hispanic male who appeared to be his stated age. He had no unusual movement patterns, postures or tics. He was dressed in worn, standard CDC inmate clothing. His facial appearance was remarkable only for facial hair and tinted spectacles. His mood was neutral and stable. His attitude was cooperative and he answered all questions completely and thoughtfully. He was fully alert, and was oriented in all spheres. His thought was coherent, linear and logical with no evidence of thought disorder. His intellectual functioning appeared to be in the low average to average range. His thought tended toward the concrete and Mr. Ybarra had difficulty forming abstractions. He was not able to tell how a chair and a table were alike, or to label 2 pieces of fruit as such. This may be more a reflection of his lack of formal education than limited intellectual capacity. He was able to follow 2-step directions without prompting, but was unable to complete 3-step directions. He was able to read a simple sentence and comply with its content. He reported difficulty with reading comprehension and vocabulary with some reading material. His memory appeared essentially intact for recent and remote events. He complained that he sometimes had difficulty remembering where he placed objects, such as his coffee cup. He denied ever becoming disoriented or lost. He reported that his concentration was sometimes lacking and that made it difficult for him to perform consistently in mastering the material for his GED preparation. He reported brief sensations of dizziness with abrupt positional change. His speech and flow of thought were within normal limits. He had no difficulty with word meanings or accessing words or object names during the interview. His comprehension of English was more than adequate for participation in the interview, and he reported no difficulty in understanding the content of the interviewer's questions or comments. His judgement appeared to be adequate for most situations. He demonstrated limited capacity for insight, minimizing his responsibility for his crime. He had some insights into the contribution of the use of drugs and alcohol to his offense.

    A. CURRENT DIAGNOSTIC IMPRESSIONS:

| | |
|---|---|
| AXIS I: | 304.80   Polysubstance Dependence (in institutional remission) |
| | 304.00   Opoid Dependence (in institutional remission) |
| AXIS II: | 301.90   Personality Disorder, NOS (Antisocial, Dependent traits) |
| AXIS III: | Elevated PSA level |
| AXIS IV: | Stressors: life sentence, lack of social support, serious medical condition, age-related declines in functioning |
| AXIS V: | GAF = 60 |

    B. Current Level of Care: Mr. Ybarra is not a participant in the MHSDS.
    C. Treatment Activities: Mr. Ybarra is not receiving treatment for a mental disorder.
    D. Medications: Mr. Ybarra is not receiving medication for the treatment of a mental illness.
    E. Prognosis: Mr. Ybarra's mental functioning is likely to remain stable as long as he continues avoid the use of alcohol, or unprescribed drugs. Mental functioning could also decline with age and should be reevaluated on a regular basis.

V. Inmate's Version of the Crime:
Mr. Y stated that the crime occurred because of "alcohol and falling in love with a woman." He and the victim had been in a relationship for seven years, prior to the crime. Mr. Ybarra believed that they were a couple and referred to the victim as his common-law wife. There was difficulty

in the relationship as both Mr. Ybarra and the victims were drug (heroin) addicts. They were both arrested on a drug charge, and she received a shorter sentence than Mr. Ybarra. The relationship became strained when she only visited him once during a 3 1/2-year incarceration. They got together again after his release. When he was again arrested, she came to the jail to visit him. At this time, she told him that she was getting off drugs and had a job working for an older disabled man, as his housekeeper. After his release, Mr. Ybarra visited her at the apartment where she was employed and left his SSI papers there. Mr. Ybarra went to the apartment once when she was not there to get his papers and was told by the man who resided there that he had kicked her out for stealing $200 from him. Five days later, Mr. Ybarra made another visit to the apartment in order to get his papers for SSI. He had been drinking on the day of the offense, and had also been fixing with heroin during that period.

As stated by Mr. Ybarra, "The old guy opened the door and I saw my old lady sitting on the couch in a bra and panties. The old guy tried to push me out. I lost my head. I don't know if I slapped the old guy. I grabbed my old lady and slapped her. She fell on the couch; she had blood on her side. She must have fallen on something sharp sticking out from the couch that cut her side. She asked me to call an ambulance, and I did."

"The guy said that I hit her with the frying pan and that I beat her up for hours. If I would have hit her, I would have broken her jaw, or she would have had bumps on her head. They took pictures of her in the "ice box" (coroner's refrigeration unit) and she looked awful, but I only slapped her. When they cut her open at the hospital they found out that she had cirrhosis, leukemia, hepatitis. I took clean clothes to the hospital and they said she didn't need clothes, that she was on a machine and they were going to pull the machine. They took her off the machine, and she died. She got pneumonia that night, and she died. I didn't beat her up. I slapped her, yea. I didn't beat her with my fists. I'm responsible…I'm responsible for her being in there (the hospital)."

When asked what his understanding was about what had killed the victim, Mr. Ybarra stated, "It was me, I guess. If I hadn't slapped her, she wouldn't have fallen on the glass, or whatever." Mr. Ybarra denied any previous history of violence in the relationship. When asked if he was directly or indirectly responsible for the death of the victim, Mr. Ybarra stated, "Directly, if I hadn't lost my head, she wouldn't have been in the hospital."

Mr. Ybarra seemed to believe that the victim's drug use or hospitalization was the major factor in her not surviving the assault. As stated by Mr. Ybarra, "They couldn't find her veins…I think she wanted to commit suicide. She wanted to do drugs; she didn't want to stop. She was a 'hope to die for fiend' who had to have drugs everyday. I wasn't a 'hope to die for dope fiend.' " "What really killed her was she didn't have veins for a blood transfusion."

Mr. Ybarra acknowledged that there were discrepancies his opinions regarding the death of the victim and reports of witnesses and experts. He believes that he assaulted both victims out of jealousy, as he believed that the man was "a sugar-daddy who gave her money for drugs." He expressed some level of remorse in that he stated, "I get "pissed off with myself when I think of her." Mr. Ybarra continues to have a need to explain that he loved the victim and has a difficult time believing that he caused her death by beating her. He related the testimony of a doctor at his trial who testified that the victim most likely died from the injuries sustained in the beating. He noted that the doctor seemed to hesitate before giving this opinion as though this left open the open the question of his culpability for the victim's death. Mr. Ybarra exhibited feelings of shame in regard to his actions and a willingness to verbally claim responsibility.

VI. Assessment of Dangerousness:
A. In a Controlled Setting:
Mr. Ybarra does not have a record of institutional violence and would be expected to continue to function in a non-violent manner, in a controlled environment where his access to alcohol or drugs is restricted. Mr.

Ybarra states that he has no interest in the use of either alcohol or drugs and never experiences a desire for either. Although Mr. Ybarra was a boxer when he was a younger man, he states that he now has nothing to prove and that he no longer has "machismo" attitudes.

B.   If Released to the Outside Community:

Mr. Ybarra's history contains many factors that have been found to be associated with increased risk of future violent behavior. His criminal offense history includes earlier offenses of violent crime. He had an earlier robbery conviction, and an earlier conviction for second degree Murder. He has failed at supervision by the court in that he had numerous arrests, convictions, jail sentences, and parole violations. He was on felony probation for assault with a deadly weapon, at the time the instant offense was committed.

Mr. Ybarra also has a history of relationship problems. Both of his murder cases involved jealousy, and possessiveness in relationships. The POR indicates that Mr. Ybarra made threats against the second victim while he was in the hospital recovering from the injuries. The second victim also reported that Mr. Ybarra had threatened to kill Ms. Delgado two days before the killing occurred.

Due to his substance abuse problems and the amount of time that he has spent incarcerated, Mr. Ybarra has a limited employment history. He has obtained a job skill while incarcerated, in that he has done upholstery work for more than 20 years. He does not have good job searching skills, or a social or employment network in the community that might assist him with securing steady employment. Mr. Ybarra's age is also likely to be a handicap in seeking work. He is now in his 70's and although he actively attends to his health, he has been alerted to a serious health concern. Given his age, health status, drug and criminal history, he is likely to need much support in order to become viably employed.

In the POR, Mr. Ybarra also described his relationship with the victim as problematic: "She was my woman since 1971 and she was always playing games…She did many bad things to me. As I said before, she has sold my car and while I was in prison she was sending some money to a guy in San Quentin. She asked me to forgive her and I did. I had a lot of patience with her."

Mr. Ybarra also has a history of inadequate socialization and supervision as a child. He had an unstable home environment with a lack of close family relationships; that is still the case for him today. His work history was limited by incarceration, limited opportunities, drug addiction, lack of job skills, and by incarceration.

While he does not have a current major mental illness or symptoms, Mr. Ybarra has a history of hospitalizations for psychiatric reasons and has attitudes and behaviors that are consistent with a diagnosis of a personality disorder.

Mr. Ybarra is also serving his second term for murder. He stated that he was 19 or 20 years old at the time of the offense. When reminded that his explanation of this earlier violent behavior differed from information contained in law enforcement documents, he stated, "That's what police say 'cause they want to get a conviction." This attitude on suggests an ongoing mistrust of authority.

While Mr. Ybarra is not married and is not presently in a romantic relationship, he maintains an interest in women and corresponds with a woman who responded to an ad placed in a magazine many years ago. Mr. Ybarra states that he would like to meet someone his age, "not a young girl." The woman who has contacted him by mail is in her early 40's, according to Mr. Ybarra He claims that she saved his address from a *Teen Angel* magazine, in 1981, where another inmate at Soledad Prison placed the ad. The woman has expressed a desire to visit Mr. Ybarra at San Quentin. He stated that he has received pictures from her and "that she looks "looks nice." He has told her the nature of his offense. As stated by Mr. Ybarra, "I told her what happened, why I'm here. I was very much in love with my old lady. I got jealous; I lost my head. If she thinks I'm a bad person, she should not write to me." Mr. Ybarra's attitude about the woman who

YBARRA, JOSE   C18150                                              October 5, 2005

contacted him suggests that he is placing responsibility for any future relationship on her. This raises concerns about Mr. Ybarra's judgement in regard to involvement with women and his ability to conduct healthy, mature relationships where his partner would not be at any risk.

VII. Comments and Recommendations:
Mr. Ybarra is to be commended for remaining disciplinary free, and for participating in educational, charitable and self-help activities. He has also continued his participation in AA and in doing upholstery work through the PIA. Mr. Ybarra has also improved his literacy and English competency; he aspires to obtain his GED. He credits his incarceration at San Quentin with saving his life. He fully rejects the use of alcohol and substances and actively works toward maintaining optimal health.

While Mr. Ybarra takes responsibility for his instant offense, his accounts of this crime and previous violent acts, are not supported by the information contained in law enforcement reports. Overall, Mr. Ybarra has improved in his socialization and ability to avoid violent conflicts. He has little need, as a senior citizen, to prove himself in the male dominance hierarchy. His rejection of any use of alcohol and drugs seems sincere. He is content to focus on maintaining the few personal relationships that are important to him, and to doing quality work as an upholsterer, and leatherwork hobbyist. He would benefit from strengthening his social support network both inside and outside of prison, possibly by reestablishing ties with family members and continuing to participate in charitable activities through the prison.

The present evaluator is in agreement with the evaluation by Dr. Francis in 2003 in which it was recommended that Mr. Ybarra continue participation in AA, participate in drug and alcohol testing as a condition of parole, and seek placement in a halfway house or supervised living program.

In addition, Mr. Ybarra would benefit from continued participation is activities such as leather work that are forms of artistic expression, mental and fine motor activity and sources of positive recognition. Mr. Ybarra has lived his entire adult life as a hard core drug addict, or convict. Other than work, he has limited experience with responsibility, decision-making, and esteem enhancing activity. He has a limited repertoire of coping skills and no proven ability to adaptively respond to stress outside of an institutional environment.

Most importantly, it should be recognized that Mr. Ybarra has only a rudimentary understanding of the skills needed to form a healthy relationship with a romantic partner. His interest in women remains focused on his own needs. While he is less impulsive and able to think more clearly, he remains largely unaware of the needs of others. He would gain some benefit from programs and activities aimed at building his capacity for empathy. He is also in need of education regarding patterns of domestic violence, including the contribution of cultural attitudes.

Mr. Ybarra has been trained as a boxer and has the reactions and mentality of a fighter. He has been twice convicted of the murder of an unarmed victim, one male and one female. While his increasing age is an attenuating factor in violence with opponents, it may be less a factor in relationships where the other person is physically weaker or smaller. While substance abuse was most likely a factor in his criminal behavior, it should not be assumed that Mr. Ybarra would be incapable of violent actions where he felt there was sufficient justification, or provocation, or where his mental capacity was compromised. Any return to the use of alcohol or drugs would further increase this risk.

_____   10-5-05
Michel Lynn Inaba, Ph.D.
Contract Psychologist