# EXHIBIT E, PART 2

28

1    PRESIDING COMMISSIONER ST. JULIEN:  Okay.

2  Well, that's awfully nice of him.  Okay.  And

3  then we have some laudatories about your work in

4  the PIA furniture factory.  And then I noticed

5  that -- So are these poems that you wrote?

6    INMATE YBARRA:  Uh-hmm.

7    PRESIDING COMMISSIONER ST. JULIEN:  Okay.

8  So do you write poetry often?

9    INMATE YBARRA:  (Indiscernible).  I'm trying

10  to get my GED.  There's these that I do

11  (indiscernible).  And then the next time I

12  can't.

13    PRESIDING COMMISSIONER ST. JULIEN:

14  Sometimes it's hard, yeah.

15    INMATE YBARRA:  Yeah.

16    PRESIDING COMMISSIONER ST. JULIEN:  Does

17  that have anything to do with your eyesight or

18  your memory?

19    INMATE YBARRA:  Memory.

20    PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21  Well, these are very good (indiscernible).  Did

22  you punctuate this yourself and spell it?

23    INMATE YBARRA:  No, the teacher did.

24    PRESIDING COMMISSIONER ST. JULIEN:  I was

25  going to say that you have proper use of --

26    INMATE YBARRA:  Yeah.

27    PRESIDING COMMISSIONER ST. JULIEN:  --

29

1    (indiscernible).

2        INMATE YBARRA:  I wrote it and she --

3        PRESIDING COMMISSIONER ST. JULIEN:  And then

4    she -- Okay.  Well, that's nice.  Okay.  And

5    then we have a letter from, is it Gloria?  So

6    you have a friend named Gloria?

7        INMATE YBARRA:  Uh-hmm.

8        PRESIDING COMMISSIONER ST. JULIEN:  Is she a

9    Bible person?  She has a Bible course here?

10       INMATE YBARRA:  Yeah, yeah.

11       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12   She writes first of all, I will pray that -- She

13   basic -- The letter is saying she is going to

14   pray for you to get a parole date.  And then we

15   have a letter from West House, and that's two

16   words.  And it's a -- It looks like a -- I see,

17   you wrote this letter to West House.  And is

18   that like a residential treatment care?

19       INMATE YBARRA:  Right.

20       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

21   Program?

22       INMATE YBARRA:  Uh-hmm.

23       PRESIDING COMMISSIONER ST. JULIEN:  So you

24   wrote letting them to -- or asking them about

25   life in their home.

26       INMATE YBARRA:  Uh-hmm.

27       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

30

1    So you can let us know.

2        INMATE YBARRA:  Yeah.

3        PRESIDING COMMISSIONER ST. JULIEN:  So this

4    is Volunteers of America Operation.  They have a

5    parolee service center, residential program.  So

6    stay up to one year, no rent, free food, free

7    laundry.  Do you think I could get a place

8    there?

9        INMATE YBARRA:  Yeah.  They (indiscernible)

10   for you.

11       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

12   They give you all kind of services, job

13   (indiscernible), substance abuse.  Okay.  Okay.

14   So is that an option you're also considering,

15   the residential care?

16       INMATE YBARRA:  Uh-hmm.

17       PRESIDING COMMISSIONER ST. JULIEN:  Okay.

18   And then we have another letter from Gloria, the

19   same person, Gloria Hernandez.  Okay.

20       INMATE YBARRA:  (Indiscernible).

21       PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

22   And she lives in San Jose.  And she's saying

23   that she's known you for a number of years.

24       INMATE YBARRA:  Yeah.

25       PRESIDING COMMISSIONER ST. JULIEN:  She

26   says, "What you see before you is a man that has

27   spent many years in the prison system.  I

31

1    believe given a chance he can be a productive
2    member of society." Okay. And then Kathy
3    Thompson with the -- it looks like another
4    residential program. And it's initials ARA.
5    And it's First (Indiscernible) in San Francisco.
6    And, again, she's describing a program. But it
7    says, "We are not allowed to accept people over
8    the age of 61." Okay. And then she says -- Did
9    you read that?
10       INMATE YBARRA: Yeah.
11       PRESIDING COMMISSIONER ST. JULIEN: Yeah.
12    Okay. And then she says she called some other
13    programs for more senior people, and she found
14    one. It's called the Golden Gate for Seniors,
15    Golden Gate for Seniors Program. And the same,
16    it's a live-in program, structured.
17       DEPUTY COMMISSIONER JOHNSON: Excuse me,
18    have you noticed the date on these letters?
19       PRESIDING COMMISSIONER ST. JULIEN: 2004.
20       DEPUTY COMMISSIONER JOHNSON: They're a year
21    old. Okay.
22       PRESIDING COMMISSIONER ST. JULIEN: Yeah.
23    Were you -- Did you get these for your last
24    hearing?
25       INMATE YBARRA: I think (indiscernible).
26       DEPUTY COMMISSIONER JOHNSON: It was after
27    the hearing, yeah.

32

1       INMATE YBARRA:  After the hearing, yeah.

2       PRESIDING COMMISSIONER ST. JULIEN:  Yeah.

3   They told you to get some more --

4       INMATE YBARRA:  Yeah.

5       PRESIDING COMMISSIONER ST. JULIEN:  --

6   firmed plans.  So you went out right away.

7       INMATE YBARRA:  Yeah.

8       PRESIDING COMMISSIONER ST. JULIEN:  So is

9   that why they're maybe a little old.

10      DEPUTY COMMISSIONER JOHNSON:  That was a

11  one-year stip.

12      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

13      DEPUTY COMMISSIONER JOHNSON:  That's why.

14      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

15  Okay.  So you would want to live in one of those

16  homes.  Now, do you know if you could get social

17  security benefits?

18      INMATE YBARRA:  Yeah, I could get -- I

19  wouldn't get (indiscernible).

20      PRESIDING COMMISSIONER ST. JULIEN:  That's

21  probably because you were -- Is that because you

22  were an addict?

23      INMATE YBARRA:  No.

24      PRESIDING COMMISSIONER ST. JULIEN:  Or do

25  you have a disability?

26      INMATE YBARRA:  No, it was -- I used to box

27  years ago, and I guess I got hit in the head.

33

1    They found out my brain wasn't functioning too

2    good.   That's why I took the test for the GED,

3    there's times that I do real good, and then

4    there's time I (indiscernible).

5         PRESIDING COMMISSIONER ST. JULIEN:   Have you

6    told your counselor about that, that injury?

7         INMATE YBARRA:   I think so.   I think I

8    (indiscernible).

9         PRESIDING COMMISSIONER ST. JULIEN:   Okay.

10   Yeah.   Because you do want to let people know

11   that that's an injury that might be preventing

12   you from, you know, performing consistently.

13        INMATE YBARRA:   It doesn't -- I mean it's

14   the memory sometimes with the -- It works.   It

15   still works.

16        PRESIDING COMMISSIONER ST. JULIEN:   Okay.

17   Do you remember the person you stabbed, the

18   (indiscernible)?

19        INMATE YBARRA:   No, I don't remember him,

20   but I --

21        PRESIDING COMMISSIONER ST. JULIEN:   I think

22   this might be the pictures of that person.

23        ATTORNEY HANDLEMAN:   Are you talking about

24   from 1958?

25        PRESIDING COMMISSIONER ST. JULIEN:   Yeah.

26        DEPUTY COMMISSIONER JOHNSON:

27   (Indiscernible).

34

1       PRESIDING COMMISSIONER ST. JULIEN:   It's

2   just strange.   Yeah.   But anyway, this is --

3       ATTORNEY HANDLEMAN:   Those look like digital

4   photos or something.

5       PRESIDING COMMISSIONER ST. JULIEN:   Yeah.

6   And they say it's 1985.

7       PRESIDING COMMISSIONER ST. JULIEN:   Wasn't

8   his name Enrique Sanchez?

9       ATTORNEY HANDLEMAN:   No.   I believe that's

10  another client that we're going to be doing

11  tomorrow.   The victim -- That's a victim of a

12  client that we're going to be doing tomorrow,

13  Enrique Sanchez.

14      PRESIDING COMMISSIONER ST. JULIEN:   Okay.   I

15  guess they got them mixed up.

16      ATTORNEY HANDLEMAN:   Yeah.

17      PRESIDING COMMISSIONER ST. JULIEN:   Okay.

18  Anyway, I was just looking at your -- Yeah,

19  you're right.

20      ATTORNEY HANDLEMAN:   Yes.

21      PRESIDING COMMISSIONER ST. JULIEN:   It's

22  robbery (indiscernible).   Okay.   I'm looking

23  through here to see if we have anything else for

24  Mr. Ybarra.   We send out 3042 Notices, which go

25  to law enforcement and the courts.   And I don't

26  -- We did not receive anything from the DA or

27  anyone else.   Actually, there's a Christmas card

35

1 from Fred and his wife I guess.  It looks like

2 there's some pictures there in a letter type to

3 you.  Okay.  Tell him to watch his language.

4 Because he has -- He has swear words in his card

5 to you.

6  INMATE YBARRA:  Yeah.

7  PRESIDING COMMISSIONER ST. JULIEN:  It's in

8 your file.

9  INMATE YBARRA:  Yeah.

10  PRESIDING COMMISSIONER ST. JULIEN:  I don't

11 think that's appropriate.

12  INMATE YBARRA:  Maybe he was writing a

13 letter to me or something and --

14  PRESIDING COMMISSIONER ST. JULIEN:  Yeah,

15 but he typed it.  Tell him not to do that

16 anymore.

17  INMATE YBARRA:  Okay.

18  PRESIDING COMMISSIONER ST. JULIEN:  Okay.

19 Because you don't want something like that in

20 your Board file.

21  INMATE YBARRA:  Maybe he didn't think it was

22 going to be in --

23  PRESIDING COMMISSIONER ST. JULIEN:  Yeah, I

24 guess he didn't.  Okay.  Well, just give him the

25 warning.  Okay.

26  INMATE YBARRA:  Yeah.  I'll tell him.

27  PRESIDING COMMISSIONER ST. JULIEN:  Okay.

1       DEPUTY COMMISSIONER JOHNSON:   Somebody did

2    white out part of it.

3       PRESIDING COMMISSIONER ST. JULIEN:   Part of

4    it.   But they didn't (indiscernible) there.

5       DEPUTY COMMISSIONER JOHNSON:   Instead of --

6    Instead of just the F word by itself, it was

7    (indiscernible).

8       PRESIDING COMMISSIONER ST. JULIEN:   Yeah.

9    Okay.   Okay.   I guess I've got your plans now.

10   Okay.   Commissioner Johnson.

11      DEPUTY COMMISSIONER JOHNSON:   Okay.

12   Mr. Ybarra, during this portion of the hearing

13   we'll cover what you've accomplished since your

14   last Board appearance.   And I (indiscernible).

15   I prepared for this by reviewing your file, this

16   (indiscernible) file, your old file.   And if I

17   leave something out, once I'm finished, you or

18   your attorney can bring me up to date.   The last

19   -- Your last appearance actually was in '03, but

20   in July of '04 you agreed to a one-year

21   stipulation based upon the recommendations from

22   the Board that you get self-help, stay

23   discipline free, and obtain commitments for

24   parole residence and financial support or

25   employment.   That was the agreement of the

26   stipulation.   Classification score is 19, level

27   II, custody medium A, assignment PIA.   And you

37

1   say you're working on your GED.  If you work PIA

2   how do you do that?

3      INMATE YBARRA:  Well, I go at night.  Twice

4   a week I go to school.  And I try to keep myself

5   busy.  On my days off I go to hobby shop, and

6   then I go to arts and corrections to do --

7      DEPUTY COMMISSIONER JOHNSON:  Okay.  I just

8   want to know about the GED.  Okay.

9      INMATE YBARRA:  Yeah.

10      DEPUTY COMMISSIONER JOHNSON:  You're doing

11   that two nights a week?

12      INMATE YBARRA:  Yeah.

13      DEPUTY COMMISSIONER JOHNSON:  And sometimes

14   you feel okay about it, and sometimes it's hard

15   for you?

16      INMATE YBARRA:  Sometimes it's hard, yeah.

17      DEPUTY COMMISSIONER JOHNSON:  Have you ever

18   taken the exam itself?

19      INMATE YBARRA:  No.

20      DEPUTY COMMISSIONER JOHNSON:  Okay.

21      INMATE YBARRA:  (Indiscernible) in what do

22   you call those, tests before you go take the

23   pretest.

24      DEPUTY COMMISSIONER JOHNSON:  Yeah.

25      INMATE YBARRA:  Pretest.

26      DEPUTY COMMISSIONER JOHNSON:  Pretest.

27      INMATE YBARRA:  And on some I do really

38

1    good, and then --

2        DEPUTY COMMISSIONER JOHNSON:  Okay.

3        INMATE YBARRA:  -- the other ones I do bad.

4    So that's the reason I don't take the test, you

5    know.

6        DEPUTY COMMISSIONER JOHNSON:  Okay.  Since

7    your last appearance you've continued in AA?

8        INMATE YBARRA:  Yeah.

9        DEPUTY COMMISSIONER JOHNSON:  There's a

10   laudatory chrono dated October 3rd, of '05 for

11   participation in San Quentin hurricane relief

12   fund, involved in arts and corrections, a chrono

13   dated March 2nd, '05 for participation in the art

14   for the community exhibit.  And March of --

15   March 9th, of '05 you had art displayed at the

16   Sonoma State Art Show.  Has remained

17   disciplinary-free, no 115s or 128s.

18   Psychological evaluation is dated October 5th,

19   '05, and it's authored by Michelle Eniva

20   (phonetic).  Dr. Eniva's current diagnostic

21   impression, Axis I, Polysubstance Abuse in

22   institutional remission, Opiate Dependence in

23   institutional remission.  Axis II, Personality

24   Disorder, Antisocial Dependent Traits.  Axis II,

25   an elevated PSA level.  Axis IV, Stressors, life

26   sentence, lack of social support, serious

27   medical condition, AIDS related, declines in

39

1  functioning, a GAF of 60. Assessment of

2  dangerousness, and she talks about it in the

3  institutional setting, and really doesn't speak

4  to it.

5          "In a controlled setting Mr. Ybarra

6          does not have a record of violence,

7          and would not be expected to

8          continue to function -- and would

9          be expected to function in a

10         nonviolent manner in a controlled

11         environment where his access to

12         alcohol is restricted. If released

13         to the outside community

14         Mr. Ybarra's history contains many

15         factors that have been found to be

16         associated with increased risk of

17         future violent behavior. His

18         criminal offense history includes

19         earlier offenses of violent crime.

20         He had an earlier robbery

21         conviction, and an earlier

22         conviction for second-degree

23         murder. He has failed at

24         supervision by the court in that he

25         had numerous arrest convictions,

26         jail sentence, parole violations.

27         He was on felony probation for

40

1.   assault with a deadly weapon at the

2    time of the instant offense was

3    committed.  Mr. Ybarra also has a

4    history of relationship problems,

5    both his murder cases involve

6    jealously, and possessiveness in

7    relationships.  The probation

8    report indicates Mr. Ybarra made

9    threats against the second victim

10   while he was in the hospital

11   recovering from injuries.  The

12   second victim also reported that

13   Mr. Ybarra had threatened to kill

14   Ms. Delgado two days before the

15   killing occurred.  Due to his

16   substance abuse problems, and the

17   amount of time he has been

18   incarcerated, Mr. Ybarra has a

19   limited employment history.  He has

20   obtained job skill while he's been

21   incarcerated in that he's done

22   upholstery work for more than 20

23   years.  He does not have a good job

24   -- He does not have good job

25   searching skills or social

26   employment network in the community

27   that might assist him with securing

41

```
 1        steady employment.  Mr. Ybarra's
 2        age is likely to be handicapped in
 3        seeking work.  He is now in his
 4        70s.  Although he activity attends
 5        to his health, he has been allergic
 6        to serious health -- to a serious
 7        health concern.  Given his age,
 8        health status and drug criminal
 9        history, he is likely to need much
10        support in order to become viably
11        employed.  In the probation
12        officer's report Mr. Ybarra
13        described his relationship with the
14        victim as problematic.  'She was my
15        woman since 1971, and she was
16        always playing games.  She did many
17        bad things to me, as I said before,
18        and she stole my car while I was in
19        prison.  And she was sending some
20        money to a guy in San Quentin.  She
21        asked me to forgive her and I did.
22        I had a lot of patience with her.'
23        And that's a quote from Mr. Ybarra.
24        Mr. Ybarra has a history of
25        inadequate socialization and
26        supervision as a child.  He had an
27        unstable home environment with lack
```

42

1   of close family relationships.

2   That is still the case for him

3   today.  His work history is limited

4   by incarceration, limited

5   opportunities, drug addiction, lack

6   of job skills and by incarceration.

7   While he does not have current

8   major mental illness or symptoms,

9   Mr. Ybarra has a history of

10  hospitalizations for psychiatric

11  reasons, and has attitudes and

12  behaviors that are consistent with

13  a diagnosis of a personality

14  disorder.  Mr. Ybarra is also

15  serving a second term for murder.

16  He stated that he was 19 or 20 at

17  the time of the offense.  When

18  reminded that his explanation of

19  his earlier violent behavior

20  differed from information contained

21  in law enforcement documents, he

22  stated, 'That's what police say

23  because they want to get a

24  conviction.'  This attitude

25  suggests an ongoing mistrust of

26  authority.  While Ybarra is not

27  married and is presently -- and is

43

1    not presently in a romantic

2    relationship, he maintains interest

3    -- and interest in women and

4    corresponds with a woman who

5    responded to an ad placed in a

6    magazine many years ago.

7    Mr. Ybarra states that he would

8    like to meet someone his age, not a

9    young girl.  The woman has

10    contacted by him by mail is in her

11    early 40s according to Mr. Ybarra.

12    He claims that she saved his

13    address from Eighteen Angel

14    Magazine in 1981 where another

15    inmate (indiscernible) in prison

16    had placed the ad.  The woman has

17    expressed a desire to visit

18    Mr. Ybarra at San Quentin.  He

19    stated that he has received

20    pictures from her, and that she

21    looks nice.  He has told her the

22    nature of his offense, and stated

23    Mr. Ybarra -- by Mr. Ybarra, quote,

24    'I told her what (indiscernible)

25    here.  I was very much in love with

26    my old lady.  I got jealous.  I

27    lost my head.  If she thinks I'm a

44

1    bad person she should not write to

2    me.' End quote. Mr. Ybarra's

3    attitude about women who contacted

4    him suggest that he's placing

5    responsibility for any future

6    relationship on her. This raises

7    concerns about Mr. Ybarra's

8    judgment in regard to involvement

9    with him and his ability to conduct

10   healthy and mature relationships.

11   Comments and recommendations:

12   Present evaluators are in agreement

13   with the evaluation by Dr. Francis

14   in 2003, which is recommended that

15   Mr. Ybarra continue participation

16   in AA, participate in drug and

17   alcohol testing as a condition of

18   parole, and seek placement in a

19   halfway house or supervised living

20   program. In addition, Mr. Ybarra

21   would benefit from continued

22   participation in his activities

23   such as leather work that are forms

24   of artistic in expressions, mental

25   and fine motor activity, and

26   sources of positive recognition.

27   Mr. Ybarra has lived half -- had

45

1   lived his entire life as a hardcore
2   drug addict or convict.  Other than
3   work, he has limited experience
4   with responsibility, decision
5   making and esteem, and enhancing
6   activity.  He has a limited
7   repertoire coping skills, and no
8   proven ability to adaptively
9   respond.  It should be recognized
10  that Mr. Ybarra has only
11  (indiscernible) understanding of
12  skills need to perform a healthy
13  relationship with a romantic
14  partner.  His interest in women
15  remains focused on his own needs.
16  While he is less impulsive and able
17  to think more clearly, he remains
18  largely unaware of the needs of
19  others.  He regains some benefit
20  from programs and activities, and
21  building his capacity for empathy.
22  He is also in need of education
23  regarding patterns of domestic
24  violence, including contribution of
25  cultural attitudes.  Mr. Ybarra has
26  been trained as a boxer and has the
27  reactions and the mentality of a

46

1        fighter.  He has twice been

2        convicted of murder of an unarmed

3        victim, one male and one female.

4        While his increasing age is an

5        annotating factor in violence with

6        opponents, it may be less a factor

7        in relationships where the other

8        woman is physically weaker or small

9        -- the other person is physically

10       weaker or smaller.  While substance

11       abuse is most likely a factor in

12       his criminal behavior, it should

13       not be assumed that Mr. Ybarra

14       would be incapable of violent

15       actions where he -- where he felt

16       there was significant justification

17       or provocation or where his mental

18       capacity was compromised.  Any

19       return to the use of alcohol or

20       drugs would further increase this

21       risk."

22  The correctional counselor's report is authored

23  by --

24     **ATTORNEY HANDLEMAN:**  Before we get to that

25  can I correct an error in the (indiscernible)

26  report?

27     **DEPUTY COMMISSIONER JOHNSON:**  Where?

47

1        ATTORNEY HANDLEMAN:  On page four under B,

2    the second paragraph where it says, "Mr. Ybarra

3    has a history of relationships.  Both of his

4    murder cases involved jealousy and

5    possessiveness in relationships."  It's my

6    recollection that his first murder case was a

7    fight with a sailor in a bar that resulted --

8    who I think he never met before, who he stabbed.

9        DEPUTY COMMISSIONER JOHNSON:  Yeah.

10       ATTORNEY HANDLEMAN:  And so it had no --

11   There was no relationship to be possessive or

12   jealous about.  So that's just for the record.

13       DEPUTY COMMISSIONER JOHNSON:  All right.

14   The correctional counselor's report is authored

15   by B. Ebert, E-B-E-R-T, for the November 2005

16   calendar.  And I've covered the therapy

17   self-help activities and disciplinary

18   (indiscernible) in summary.  The counselor says:

19            "Mr. Ybarra continues to attend AA

20            classes as recommended by the BPT.

21            He's also attending spiritual

22            classes at the Catholic chapel.  He

23            has remained disciplinary-free

24            throughout his incarceration, and

25            he is continuing to maintain a very

26            positive program.  He states that

27            he has accepted the responsibility

48

1           for the crime that he committed.

2           He just wants to do his time

3           without any problems."

4  Did I leave anything out?

5    **ATTORNEY HANDLEMAN:**  On the chronos and

6  programming there was a little bit of -- For one

7  thing, since his last hearing was in 2003, so

8  we're looking at (indiscernible) since 2003,

9  since like 2003 when he had his last hearing.

10  So he had -- He completed the vocation.  He has

11  a certificate as a certified upholsterer with

12  15,000 plus hours.  That's a certificate of

13  November 4th, 2004.  And then there's a -- In

14  December 2003, a chrono for weekly religion

15  classes at the Catholic chapel.  Also, December

16  24th, 2003, San Quentin hobby shop, children's

17  Christmas program, donated time, supplies and

18  skills to make toys and gifts for local children

19  shelters.  March 11th, 2004, a laudatory chrono

20  from Reverend Barbara, the Catholic chaplain,

21  committed (indiscernible), dedicated assistance

22  in helping reupholster the furniture for the

23  alter sanctuary.  January 4th, 2005, so that's,

24  again, the (indiscernible) hobby shop,

25  (indiscernible) skills for the local children's

26  shelter.  So that's the (indiscernible).  He's

27  gotten Alcoholics Anonymous chronos, all four of

49

1  them in 2003, all four of them in 2004, and the

2  first three-quarters of this year.  And there's

3  just a -- There was a laudatory chrono in June

4  16th, 2004 from his upholstery supervisor Wendy

5  Holmes.  (Indiscernible) upholstery trade.  He

6  will have no problem gaining employment or trade

7  when he's paroled.  He will be an asset to any

8  upholstery shop and/or furniture manufacture

9  anywhere.  And a certificate from the Vietnam

10  Veteran's group of San Quentin to support their

11  charitable programs.  That's December 4th, 2004.

12  I think that about covers it.

13      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

14  Any other questions?

15      ATTORNEY HANDLEMAN:  I don't have any

16  questions.

17      PRESIDING COMMISSIONER ST. JULIEN:  Okay.

18  We need to take a recess for a minute.

19      DEPUTY COMMISSIONER JOHNSON:  Yeah.

20      PRESIDING COMMISSIONER ST. JULIEN:  Yeah.  I

21  guess.

22              (Off record)

23      DEPUTY COMMISSIONER JOHNSON:  We're back on

24  the record.

25      PRESIDING COMMISSIONER ST. JULIEN:  All

26  right.

27      DEPUTY COMMISSIONER JOHNSON:  We're back on

50

1 the record.  It is 8:40 a.m., December 2nd.  This

2 is the extension of the hearing that was held

3 yesterday for Jose Ybarra, C-18150.  The reason

4 for the delay was there was an institutional

5 emergency last night, and we had to evacuate the

6 premises.

7   PRESIDING COMMISSIONER ST. JULIEN:  Okay.

8 And I think we left off right before

9 Mr. Handleman was going to give his closing

10 statement.  So would like to proceed with that

11 now?

12   ATTORNEY HANDLEMAN:  Yes.  I believe Ybarra

13 has been incarcerated now for 26 years on a 20

14 to life sentence.  That was second-degree murder

15 with five years of enhancement.  So even without

16 factoring in the goodtime credits, his

17 incarceration has now exceeded the sum of his

18 five years of sentencing enhancement twice.  The

19 suggested base term of 18 to 20 years, which is

20 Title XV, Section 2403(c), row II, prior release

21 and (indiscernible) C where there were multiple

22 wounds.  Therefore, the determining issue before

23 the Board now is whether he's suitable for

24 parole, which is it turns on whether or not

25 he'll pose an unreasonable risk of danger to

26 society if released from prison.  With respect

27 to his parole eligibility, I think two factors

51

1    should be highlighted, first alcohol and drugs

2    were a prime factor in his commitment offense,

3    prime cause.  And he has been extensively

4    involved in Alcoholics Anonymous to come to

5    terms with his addiction.  And through this 12

6    Step involvement, and through the introspection

7    that resulted in his lengthy incarceration,

8    Mr. Ybarra's character has changed so that he's

9    no longer the angry man who he was until Linda

10   Delgado.  And second, I think another really

11   critical thing the Board should consider is his

12   advanced age and (indiscernible) health.  He's

13   72 years old.  And at that age the likelihood

14   that he could pose a danger to anyone in society

15   is greatly diminished.  And finally, there's

16   been the factor of remorse.  Mr. Ybarra takes

17   full responsibility for his (indiscernible)

18   conduct.  He fully recognizes the wrongfulness

19   and the gravity of taking Ms. Delgado's life, as

20   you'll hear more from him.  He's been discipline

21   free during his entire incarceration.  He hasn't

22   even received a counseling -- not even so much

23   as a counseling chrono, a 128(a), since 1996.

24   And I think that Mr. Ybarra's (indiscernible) to

25   prison rules and regulations evidences his

26   desire and ability to conform his conduct to the

27   laws of the free society.  His C-File is replete

52

1    with laudatory and favorable chronos.  Among the

2    highlights, consistent participation in

3    Alcoholics Anonymous going on 20 years, since

4    1986.  He's overcome his substance abuse

5    addictions, as I've said before.  He also has

6    certificates from Man Alive, (Indiscernible)

7    Adult School, life and job skill workshop.  And

8    there's several laudatory chronos that

9    (indiscernible) generosity and compassion, a

10   member of San Quentin's hobby shop program,

11   doing (indiscernible) skills, toys and gifts for

12   local children's shelters.  He's being commended

13   by Reverend Barbara, the Catholic chaplain for

14   work he's done throughout the sanctuaries,

15   donating candy, candy crafts, for victims of the

16   911 terrorists attacks, and the hurricane relief

17   fund.  And he continues to pursue his

18   educational opportunities with regular

19   attendance and excellent student towards his

20   GED.  And then most importantly, extremely

21   impressive vocational endeavors with certified

22   upholster with over 15,000 hours, and a letter

23   of (indiscernible) saying he's employable

24   anywhere in the upholstery trade.  No problem

25   with gaining employment when he's paroled.  And

26   then he's fortunate to have an offer of housing

27   and support for his basic necessities from his

53

1    friend Fred Carty of San Rafael.  And Mr. Carty
2    said, as we've read into the record, very
3    positive words and respectful words for
4    Mr. Ybarra.  So it's a very genuine offer.  And
5    then I think the most important thing is just
6    that he's -- that he's a frail elderly man of 72
7    years of age, and it makes no sense to
8    incarcerate him beyond the point where he can no
9    longer hurt anyone.  I think that's the most
10   fundamental fact here.  In view of his advanced
11   age, his poor health, his impeccable
12   disciplinary record, two decades of immersion of
13   AA, employability, realistic plans, he's now
14   highly suitable for parole.
15        PRESIDING COMMISSIONER ST. JULIEN:  Okay.
16   Thank you, sir.  Mr. Ybarra, do you have
17   anything you'd like to add regarding your
18   suitability?
19        INMATE YBARRA:  Well, Ma'am, I'd just like
20   to say that I'm no danger to society.  I can
21   help youngsters over there in the streets, you
22   know, you know, they're in gangs, you know.  I
23   can talk to them.  I helped two persons in here,
24   which it was Fred, and the other one was
25   (Indiscernible), my cell partner.  And he went
26   out there and he went to college, and finished
27   college.  Now he's -- Now he's some kind of a --

54

1  something, a (indiscernible).  And he thanked me

2  for helping him, you know, and still out there.

3  I can do the same thing for my nephews that they

4  get in gangs, you know.  Maybe I can go help

5  them.  I guess that's all.

6       PRESIDING COMMISSIONER ST. JULIEN:  Okay,

7  sir.  Okay.  Thank you very much.  We'll now

8  recess for deliberations.

9                    R E C E S S

10                   --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

55

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3        PRESIDING COMMISSIONER ST. JULIEN:   Okay.

4    All parties have returned to the room in the

5    hearing for Mr. Jose Ybarra.  And, Mr. Ybarra,

6    we are going to deny you parole today.  We're

7    going to deny you parole for another year.

8    We've reviewed all the information received from

9    the public and relied on the following

10   circumstances in concluding that the inmate is

11   not yet suitable for parole and would pose an

12   unreasonable risk of danger to society or a

13   threat to public safety if released from prison.

14   Specifically, as in regards to the commitment

15   offense, the offense was carried out in an

16   especially cruel and callous manner in that the

17   victim in this case, Linda Delgado, who was age

18   49 at the time, was killed by the inmate.  She

19   suffered at the hands of the inmate.  She was

20   beaten with a frying pan from the kitchen, and

21   then kicked and attempted to be choked.  And she

22   was taken to the hospital for these injuries and

23   died at the hospital approximately three days

24   later.  This offense was carried out in a manner

25   which demonstrates an exceptionally callous

26   disregard for human suffering in that indeed

27   JOSE YBARRA   C-18150   DECISION PAGE 1   12/1/05

56

1   Ms. Delgado certainly must have suffered great

2   trauma and distressed during this beating

3   (indiscernible).  And the motive for the crime

4   was inexplicable or very trivial in relation to

5   the offense in that apparently Mr. Ybarra was

6   jealous over the victim and the other victim in

7   this case, Mr. Barbutes.  And these conclusions

8   are drawn from the Statement of Facts wherein

9   they state that:

10       "On November 10, 1979 Mr. Ybarra

11       entered the premises of John

12       Barbutes and immediately began

13       punching Mr. Barbutes, a

14       paraplegic, about the face and

15       head.  He then obtained a frying

16       pan from the kitchen and beat

17       Ms. Delgado with a frying pan to

18       the point of unconsciousness, then

19       began kicking her.  At one point

20       tried to choke her.  When

21       Mr. Barbutes tried to give some

22       Ms. Delgado some assistance, Ybarra

23       struck Mr. Barbutes in the head

24       with a glass bottle and then fled

25       on foot.  And Ms. Delgado succumbed

26       to those injuries three days

27   JOSE YBARRA   C-18150   DECISION PAGE 2   12/1/05

57

1       later."

2    And in terms of prior criminal record,

3    Mr. Ybarra has an escalating pattern of criminal

4    conduct and violence, and a record of violence

5    and assaultive behavior, and has failed to

6    profit from society's previous attempts to

7    correct his criminality (indiscernible) prior

8    prison terms.  There's also a history of an

9    unstable social life, which includes illegal

10   narcotics, alcohol abuse for many years, as well

11   as arrests for petty theft, assault with a

12   deadly weapon, burglary, robbery, as well as a

13   second-degree murder.  And a psychological

14   report dated October 5th, 2005 authored by

15   Dr. Eniva is conditional wherein she states at

16   the end of her report:

17       "Mr. Ybarra's been twice convicted

18       of murder of an unarmed victim, a

19       male and a female.  While his

20       increasing age is an

21       (indiscernible) factor,

22       (indiscernible) was a factor in

23       relationships where the other

24       person (indiscernible).  While

25       substance abuse is most likely a

26       factor in his criminal behavior, it

27   JOSE YBARRA   C-18150   DECISION PAGE 3   12/1/05

58

1          should not be assumed that

2          Mr. Ybarra would be (indiscernible)

3          where he felt there was sufficient

4          justification or provocation of

5          (indiscernible)."

6  And that's in (indiscernible). In terms of

7  parole plans, the inmate appears to have

8  realistic parole plans in that he has firmed up

9  his parole plans. He was asked to do so last

10  time. In terms of residence, he does have

11  marketable skills in the upholstery and

12  vocational dry cleaning. However, we do note

13  that (indiscernible) Mr. Ybarra's advancing age

14  and deteriorating health his beat option might

15  be (indiscernible). And we make the following

16  findings: In -- I'm sorry, in view of the

17  inmate's assaultive history there is no

18  indication that (indiscernible). Nevertheless,

19  we would commend him for being

20  disciplinary-free, (indiscernible) achievement,

21  participation in AA, arts and corrections,

22  (indiscernible), the Vietnam Vets group, and

23  (indiscernible) religious program,

24  (indiscernible) program, as well as obtaining

25  (indiscernible) and dry cleaning vocation. And,

26  therefore, a longer period of observation and

27  **JOSE YBARRA  C-18150  DECISION PAGE 4  12/1/05**

59

1  evaluation of the inmate is required before the

2  Board should find that he is suitable.  Do you

3  have any comments?

4      DEPUTY COMMISSIONER JOHNSON:  No.

5      PRESIDING COMMISSIONER ST. JULIEN:  No.

6  Okay.  Sir, well, we definitely wish you good

7  luck.  Okay.  We will adjourn the hearing.  It

8  is 9:00 a.m.

9                    --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON:___MAR 3 1 2006___

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  JOSE YBARRA  C-18150  DECISION PAGE 5  12/1/05

60

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, CONNIE MASTIN, a duly designated transcriber, PETERS SHORTHAND REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 59, and which recording was duly recorded at CALIFORNIA STATE PRISON, SAN QUENTIN at SAN QUENTIN, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JOSE YBARRA, CDC No. C-18150, on DECEMBER 1, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 15, 2005, at Sacramento County, California.

*Connie Mastin*

Connie Mastin
Transcriber
**PETERS SHORTHAND REPORTING**